UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

FINANCIAL TECHNOLOGY PARTNERS LP
and FTP SECURITIES LLC,

                       Plaintiffs,

           v.

ALOGENT CORPORATION,

                     Defendant.
-----------------------------------------------------------X



JUDGE PRESKA

Case No.

08 CV 2510

MAR 12 2008

U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

For its complaint, plaintiffs Financial Technology Partners LP ("Financial Technology Partners") and FTP Securities LLC ("FTP Securities") (collectively "FT Partners") allege against defendant Alogent Corporation ("Alogent") as follows:

### NATURE OF ACTION

1.      This is an action for breach of contract arising out of Alogent's failure to honor its obligations under a written contract, dated February 23, 2007, between FT Partners and Alogent pursuant to which Alogent retained FT Partners as its exclusive financial and strategic advisor in connection with possible transactions, including the potential sale of 50% or more of Alogent's stock to a third-party purchaser (the "Contract"). Pursuant to the terms of the Contract, Alogent agreed to pay FT Partners a fee for its services upon the consummation of such a sale of Alogent in accordance with a schedule set forth in that Contract (hereinafter the "Success Fee").

2.      In the months following execution of the Contract, FT Partners worked diligently to find a buyer for Alogent at the highest possible price. As a direct result of that work, on January 17, 2008, Goldleaf Financial Solutions, Inc. ("Goldleaf") acquired

100% of the capital stock of Alogent. Following the announcement of the Goldleaf

transaction, Alogent's CEO, Brian Geisel, wrote to Steve McLaughlin, Managing

Director of FT Partners, thanking Mr. McLaughlin for "the many hours that you and your

team put into this process." Indeed, Mr. Geisel candidly acknowledged that FT Partners

"did help to get us to [a] great result" and that FT Partners' efforts "[p]ushing us to

produce the quality work and message to the prospects was key."

3.    Despite the undisputed fact that the work of FT Partners was "key" to

Alogent's deal with Goldleaf, Alogent has failed to pay FT Partners the full Success Fee

FT Partners earned under the Contract. Rather, in breach of its obligations under the

Contract, Alogent has artificially and improperly attempted to understate the amount of

the consideration it received from Goldleaf by, among other things, "netting out" from

the calculation of the aggregate consideration it received from Goldleaf the Success Fee

Alogent owes to FT Partners pursuant to the Contract.

4.    Specifically, the Success Fee schedule in the Contract entitles FT Partners

to, among other things, a minimum fee of $1 million, plus 10% of the "aggregate

consideration" achieved in the transaction over $25 million, plus an additional $1 million

bonus in the event that the "aggregate consideration" achieved is equal to or in excess of

$45 million. The aggregate consideration achieved in the transaction was $46.8 million

(consisting of a $45 million enterprise value plus an additional $1.8 million positive

working capital adjustment). However, rather than calculating the Success Fee based on

a figure of $46.8 million, Alogent has improperly deducted certain fees and management

bonuses from the aggregate consideration it achieved in order to deflate artificially the

purchase price below $45 million in an attempt to reduce substantially the Success Fee

2

owed to FT Partners and, in particular, to attempt to eliminate the $1 million bonus it owes.

5.      While Alogent has acknowledged that FT Partners is entitled to a Success Fee under the Contract and has, accordingly, made payment to FT Partners of a portion of that fee, Alogent has refused to pay FT Partners the entire Success Fee required to be paid by the express terms of the Contract. The amount of Alogent's underpayment is at least $1.4 million, plus interest at the rate specified in the Contract.

## PARTIES

6.      Plaintiff Financial Technology Partners is a Delaware limited partnership. Plaintiff FTP Securities is a limited liability corporation organized under the laws of the state of Delaware. Financial Technology Partners and FTP Securities provide investment banking services to their clients focused exclusively on the financial technology sector and they maintain their principal place of business at 601 California Street, 22nd Floor, San Francisco, California 94108.

7.      Defendant Alogent was founded in 1995 by its current CEO, Brian R. Geisel. According to its web site, Alogent is a world leader in delivering innovative enterprise payment processing solutions that enable financial institutions and processors to accelerate the conversion of paper to electronic processing. Alogent is organized under the laws of the state of Georgia and maintains its principal place of business at 4005 Windward Plaza, Second Floor, Alpharetta, Georgia 30005.

## JURISDICTION

8.      The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). There is complete diversity of citizenship as this action is brought by Financial Technology Partners, a Delaware limited partnership none of whose members reside in

3

Georgia, and FTP Securities, a limited liability corporation organized under the laws of

Delaware with its principal place of business in California, against Alogent, a Georgia

corporation with its principal place of business in Georgia. The amount in controversy

exceeds the sum of $75,000, exclusive of interest and costs.

       9.     Venue is proper in this District as expressly agreed by both Alogent and

FT Partners in the Contract.

## FACTS

### Alogent's Early Attempts to Find a Buyer

      10.     Upon information and belief, in 2006, Alogent's officers and directors

decided to seek a purchaser for the company. Accordingly, Alogent engaged an

investment banking firm, Updata Advisors ("Updata"), to help identify prospective

purchasers of Alogent's stock at the highest possible price. Unfortunately for Alogent,

Updata was able to obtain bids from prospective purchasers that reportedly were either

well below the price that Alogent hoped to achieve, or were abandoned. Accordingly,

Alogent terminated its deal with Updata and decided to start over in its efforts to find a

purchaser for the company. Upon information and belief, because Updata was not able to

find a suitable purchaser for Alogent at an appropriate price, Updata was never paid the

success fee that it would have been owed had a sale been consummated.

### Alogent Retains FT Partners in an Effort to
### Obtain a Successful Purchaser and a Higher Sale Price

      11.     In early 2007, Alogent approached FT Partners and requested that FT

Partners use its expertise to help Alogent identify an appropriate party to purchase the

company at a price higher than the offers it had received to that point. Upon information

and belief, Alogent's decision to contact FT Partners was influenced by the quality of FT

4

Partners' investment banking services, its industry knowledge, relationships and senior level experience. In particular, FT Partners recently had provided investment banking services in connection with the sale of Corillian Corporation ("Corillian") to CheckFree Corporation ("CheckFree") for $245 million in cash. The fact that CheckFree was a past and potentially future bidder for Alogent, and that CheckFree was seen by many in the industry as having paid a tremendously attractive price to Corillian's shareholders, enhanced Alogent's desire to retain FT Partners in connection with its potential sale. By retaining FT Partners, Alogent would be able to avail itself of FT Partners' relationship with CheckFree, as well as its detailed repository of information on the financial technology sector and its participants and its unique relationships with key CEOs and private equity professionals in the sector.

12.    On January 12, 2007, McLaughlin met with Geisel and Mark Dunkel, an Alogent director, to discuss Alogent's possible retention of FT Partners. While FT Partners was interested in working with Alogent, given the relatively small size of the potential transaction, FT Partners was concerned about its ability to earn an attractive enough success fee relative to the risks and time involved on any transaction in light of the potentially significant lost opportunities and tremendous time commitment that would be required of it. The fact that Alogent's prior investment advisor, Updata, had been terminated by and received nothing for its significant work further highlighted the risk to FT Partners involved in accepting the retention with the Success Fee being paid only upon consummation of a transaction.

13.    Accordingly, in an e-mail to Geisel and Dunkel sent on the afternoon of January 12, 2007, McLaughlin proposed the following four-part fee structure: (i) a

retainer of $100,000; (ii) a minimum fee of $1 million upon the closing of a sale of

Alogent's stock or assets; (iii) an additional 10% of the aggregate consideration achieved

in such transaction in excess of $25 million; and (iv) an additional $1 million bonus in the

event that FT Partners was able to achieve an aggregate consideration of at least $45

million.

14.    On or about January 29, 2007, Alogent's board discussed the FT Partners

proposal. On January 30, 2007, Geisel sent an e-mail to McLaughlin stating that Alogent

believed that FT Partners was "well qualified to assist in this sale of Alogent" but

requesting some changes to FT Partners' proposed Success Fee. Among other changes,

Geisel proposed lowering the retainer to $60,000 and lowering the minimum fee to

$600,000. Notably, Geisel stated that Alogent was "fine" with the proposed $1 million

bonus in the event FT Partners achieved aggregate consideration of at least $45 million.

15.    Later on January 30, 2007, McLaughlin sent an e-mail to Geisel

responding to Alogent's proposal for a lower Success Fee. McLaughlin stated that given

the time and effort that would be involved and the skills and compensation of the FT

Partners employees, the company could not lower the retainer or minimum fee. While

FT Partners expressed a willingness to negotiate some trade-offs regarding its fees, it

essentially reiterated its earlier proposal and said it would not make substantive changes.

In closing, McLaughlin reminded Geisel that FT Partners was taking a significant risk

given that Alogent could refuse to consummate any potential transaction identified by FT

Partners, no matter what the price, thereby leaving FT Partners with only its $100,000

retainer. As McLaughlin further noted, this was not an insignificant risk in light of the

fact that Alogent had already fired its prior investment banker, Updata.

6

**Alogent and FT Partners Enter Into the Contract**

16.     Following the e-mail exchange between McLaughlin and Geisel, FT Partners and Alogent continued to negotiate the terms of a proposed agreement. On February 23, 2007, Alogent and FT Partners entered into the Contract at issue in this action. A copy of the Contract is attached hereto as Exhibit A. The Contract was executed on behalf of plaintiffs Financial Technology Partners and FTP Securities by Mr. McLaughlin and on behalf of Alogent by Mr. Geisel.

17.     Consistent with McLaughlin's January 30, 2007 e-mail, the Contract reflected virtually the identical fee structure first proposed by FT Partners on January 12, 2007. Thus, in addition to the $100,000 retainer, on page one the Contract sets out the formula for the amount of the Success Fee owed by Alogent to FT Partners in the event that Alogent successfully found an acceptable buyer for its stock or assets. The Contract states:

> In connection with the consummation of a transaction or series of transactions in which one or more purchasers acquire directly or indirectly 50% or more of the voting stock, assets (based on the book value of [Alogent]), revenue, income or business, or otherwise gains voting or Board control of [Alogent], regardless of the structure or form of the transaction (a "Company Sale Transaction"), the transaction success fee payable to FT Partners shall be (i) a minimum of $1.0 million, <u>plus</u> (ii) 10% of aggregate consideration paid in such transaction in excess of $25 million, <u>plus</u> (iii) in the event that aggregate consideration is at least $45 million, an additional $1.0 million.

(*See* Contract, Exhibit A, at p.1, emphasis in original.)

18.     Consistent with Geisel's agreement in his January 30, 2007 e-mail to McLaughlin, the Contract provided for a $1 million bonus payable to FT Partners in the event Alogent achieved "aggregate consideration" of more than $45 million in connection with its sale. Given that Updata's earlier solicitation of bids reportedly had

resulted in only one bid of no more than $25 million (and was never even pursued by the reported buyer), it is not surprising that Geisel was "fine" with paying a $1 million bonus should FT Partners assist Alogent in achieving aggregate consideration of $45 million.

19.    The Contract goes on to specify what was to be included in determining the "aggregate consideration" for any sale of Alogent for purposes of determining the fee owed to FT Partners. The Contract specifically states in applicable part:

> The aggregate consideration for purposes of calculating a transaction success fee in the case of a Company Sale Transaction shall be:
>
> (i)    in the case of the sale, exchange or purchase of [Alogent's] equity securities, the total consideration paid for such securities (including amounts paid to holders of options, warrants and convertible securities), plus the principal amount of all indebtedness for borrowed money as set forth on the most recent balance sheet of the Company prior to the consummation of such sale, exchange or purchase.

(*Id.* at p.1.)

20.    Notably, the Contract does not state that in calculating the "aggregate consideration" that Alogent was permitted to exclude or "net out" the amount of FT Partners' Success Fee. Similarly, the Contract does not state that Alogent was permitted to exclude or "net out" any other fees or expenses or transaction bonuses from the calculation of the aggregate consideration. In fact, the Contract specifically includes "amounts paid to holders of options, warrants and convertible securities" in the definition of aggregate consideration.

## FT Partners' Work in Finding a Buyer for Alogent

21.    Following the execution of the Contract, FT Partners spent many months and significant numbers of hours in exhaustive efforts to find a suitable buyer for Alogent and to maximize the aggregate consideration that Alogent achieved for its sale. FT Partners' team of advisors worked on the Alogent matter and spent hundreds of hours

creating financial models and PowerPoint presentations, and advising on a due diligence

data room in order to identify an appropriate party to purchase Alogent's stock or assets

and accomplish a sale.

22.    As a result of its diligence and efforts, FT Partners contacted more than 45

interested buyers and obtained four bids for the sale of Alogent, ranging in aggregate

consideration from $17 million to $33 million. Subsequent negotiation resulted in

increases in those bids ranging in aggregate consideration from approximately $40

million to nearly $47 million. The favorable results generated by the efforts of FT

Partners stands in marked contrast to the bids obtained by Updata.

**Goldleaf's Acquisition of Alogent.**

23.    One of the potential purchasers identified by FT Partners for Alogent was

Goldleaf.  As set forth on its web site, Goldleaf provides a full suite of technology-based

products and services that help community financial institutions improve operational

efficiency and customer service, gain a competitive edge in the marketplace, increase

profitability and satisfy regulatory requirements.

24.    Negotiations between Alogent and Goldleaf continued throughout the Fall

of 2007 during which time Goldleaf made multiple bids. The first bid from Goldleaf, on

October 18, 2007, was for $27.5 million. The second bid from Goldleaf, on November

20, 2007, was $32 million. The third bid, on November 26, 2007, was $40.5 million. On

December 13, 2007, Goldleaf again raised its bid and provided Alogent and FT Partners

with a Non-Binding Acquisition Proposal in which Goldleaf offered to acquire 100% of

the capital stock of Alogent for $45 million in cash and securities, to be adjusted based

upon the assumption that Alogent's closing date net working capital would be at least $1.9 million.

25.    Given that Alogent's net estimated working capital at closing was and would have been $3.7 million, Goldleaf effectively offered aggregate consideration of $46.8 million to Alogent shareholders, which those shareholders could use to pay commissions and expenses and then divide the remaining amount among themselves (reflecting the fact that $3.7 million of actual net working capital is $1.8 million more than the minimum amount required by Goldleaf's proposal).

**Alogent Attempts Improperly to Decrease the Amount of the
Payment Owed to FT Partners Under the Express Terms of the Contract**

26.    On November 29, 2007, Alogent had provided FT Partners with an Excel spreadsheet, related to an offer Alogent received from a different potential buyer, Computer Services Corporation ("CSC") (the "CSC Spreadsheet"). Notably, in the CSC Spreadsheet, Alogent had calculated the Success Fee owed to FT Partners using the total value it was expecting to receive and did not "net out" the Success Fee. As a result, the CSC Spreadsheet reflected that FT Partners would have been entitled to a Success Fee in excess of $4 million on an assumed value of $45.8 million.

27.    Surprisingly, the very next day, Alogent sent FT Partners a different spreadsheet (related to Goldleaf's offer) that attempted to reduce FT Partners' Success Fee by netting out the fee itself (as well as certain company bonuses and other expenses) from the aggregate consideration Alogent achieved. Alogent's deductions were not called for by the Contract and were in fact inconsistent with both business practice and the terms of the Contract itself. Pursuant to the terms of the Contract, FT Partners' Success Fee was contingent upon the consummation of a Company Sale Transaction.

10

(*See* Contract, Exhibit A, at p. 1.) Furthermore, payment of FT Partners' Success Fee was a condition to the closing of such transaction. (*Id.* at p. 2.) Thus, the Success Fee was not earned until and unless Alogent closed on the sale transaction. Despite this fact, Alogent sought to deduct, in advance, FT Partners' as yet unearned Success Fee from Alogent's balance sheet.

28.    During the ensuing weeks, Alogent refused to acknowledge that its revised method of calculating the Success Fee was incorrect. Indeed, during this time period, Alogent communicated very little with FT Partners. However, FT Partners came to understand that as a result of ongoing negotiations, the aggregate consideration being achieved by Alogent from Goldleaf was $46.8 million, which was comprised of a $45 million enterprise value plus an additional $1.8 million working capital adjustment. Those figures were reflected in an updated spreadsheet prepared by Alogent in early January 2008 and provided to FT Partners. However, Alogent continued to indicate that it would "net out" the Success Fee as well as various management bonuses and other closing expenses from the aggregate consideration it achieved and thereby artificially deflate the FT Partners Success Fee.

29.    Accordingly, on January 11, 2008, Mr. McLaughlin sent an e-mail to Mr. Geisel attaching an invoice for the amount Alogent owed to FT Partners for fees and expenses associated with the Goldleaf transaction. Using the numbers set forth in the Goldleaf term sheet that FT Partners had received from Alogent, FT Partners calculated that Alogent was liable for a total Success Fee of $4.18 million based on the $46.8 million aggregate consideration.

30.     On January 14, 2008, Mr. Geisel sent an e-mail response to Mr.
McLaughlin's January 11th e-mail. In this January 14th e-mail, Mr. Geisel stated that
Alogent disputed the $4.18 million Success Fee claimed in the invoice from FT Partners.

31.     Alogent and Goldleaf entered into their final Agreement and Plan of
Merger on January 17, 2008, pursuant to which Goldleaf agreed to purchase 100% of the
capital stock of Alogent for "total consideration" which the parties stated to be $42.6
million, but which reflected over $4 million in improper deductions (including the
Success Fee, estimated closing costs, executive incentive bonuses, and a Board of
Directors bonus). Goldleaf's final proposal stated that "Goldleaf would acquire Alogent
by merger for an amount equal to $45 million, to be adjusted upward or downward based
upon Alogent's closing date net working capital being equal to $1.9 million (the
"Purchase Price")." FT Partners' understanding based on the last information received
from Alogent in regards to its working capital indicated that because Alogent would have
had $3.7 million of positive working capital at closing before deductions, Goldleaf would
have paid $46.8 million for Alogent at that time, accounting for the dollar for dollar
upward adjustment for excess working capital. Hence, this is the appropriate figure to be
used for "aggregate consideration."

32.     Given that it made no economic difference to Goldleaf whether it paid a
higher amount for extra working capital or a lower amount for less working capital, under
either method FT Partners achieved aggregate consideration for Alogent of $46.8 million.
If there were no fees or bonuses, that is the amount Alogent's shareholders would have
received. Alogent's obligation to pay transaction fees and payment of bonuses to

management and Board members had no bearing on the aggregate consideration available to pay obligations.

33.    Having achieved such large aggregate consideration, Alogent was understandably thrilled with the work of FT Partners. Thus, it was no surprise that in a January 18, 2008 e-mail to Mr. McLaughlin, after the announcement and despite the dispute, Mr. Geisel admitted that he "respect[ed] the value that you and your team brought to this process.... Thank you for the late nights and very early PST mornings that you [and] your team invested through 2007. You and Tim [and] Alan did help to get us to [a] great result. Pushing us to produce the quality work [and] message to the prospects was key. Please especially pass my thanks to Alan Tikwart for the many hours of work that he did in learning our business and producing the high quality presentation and messaging working closely with Chad [and] I."

34.    Yet, despite acknowledging the quality of FT Partners' work and the indisputable impact of that work on the aggregate consideration achieved by Alogent's shareholders, Alogent attempted to deny FT Partners a critical portion of the Success Fee which it so obviously earned. Thus, on January 18, 2008, Mr. Geisel sent an e-mail to Mr. McLaughlin in which he stated that Alogent disagreed with FT Partners' calculation of the Success Fee owed by Alogent under the terms of the parties' Contract.

35.    Also on January 18, 2008, Mr. Geisel stated that Alogent had wired a payment of $2,758,293.07 to FT Partners the prior morning. Mr. Geisel claimed that this represented full payment of the amounts owed by Alogent to FT Partners under the Contract. Mr. Geisel also stated that the amount wired was net of Alogent's previous $100,000 payment to FT Partners, in accordance with the terms of the Contract.

36.    Alogent's calculation of the FT Partners Success Fee was entirely incorrect. Put simply, Alogent had obtained approximately $46.8 million in value from Goldleaf. As a result of the sale, Alogent became obligated to pay the Success Fee, legal fees, closing costs and certain management bonuses. The fact that Alogent chose to pay those obligations off the balance sheet, pre-closing, does not change the fact that Alogent's shareholders were allowed to share in $46.8 million. Notably, the Success Fee owed to FT Partners was the biggest deduction taken by Alogent, and therefore inclusion of this fee alone would have increased the aggregate consideration paid for the transaction to more than $45 million.

37.    Pursuant to the Contract, Alogent was obligated to pay FT Partners the full amount of the Success Fee earned by FT Partners "in cash simultaneous with, or prior to, the consummation of ...[the] transaction as a condition to the closing of such transaction." (*See* Contract, Exhibit A, at p.2.) Further, if Alogent failed to pay FT Partners the full amount of its Success Fee in the amount and time required by the Contract, "the unpaid fees and expenses due to FT Partners shall bear interest at the rate of two percent (2%) per month, or the highest rate permitted by law if less, until paid in full." (*Id.*) Accordingly Alogent is obligated to pay FT Partners the remainder of the Success Fee together with interest at 2% per month on the amount outstanding.

## COUNT I
### (Breach of Contract)

38.    FT Partners realleges and incorporates by reference the allegations contained in paragraphs 1 through 37, as if fully set forth herein.

39.    The Contract is a legally enforceable agreement, made for valid consideration, which obligated Alogent to pay FT Partners a Success Fee for its services

upon the consummation of the sale of 50% or more of Alogent's stock to a third-party purchaser. This Success Fee was to be calculated in accordance with the following schedule: (i) a minimum of $1 million, plus (ii) 10% of aggregate consideration in excess of $25 million, plus (iii) in the event that aggregate consideration is at least $45 million, an additional $1 million.

40.    FT Partners satisfied its obligations under the Contract.

41.    Alogent breached the Contract by refusing to pay FT Partners the entire Success Fee required by the express terms of the Contract upon sale of 100% of the capital stock of Alogent to Goldleaf.

42.    As a direct and proximate result of the foregoing breach, FT Partners was damaged in an amount in excess of $1.4 million, plus interest from January 17, 2008 at the contractually agreed rate of two percent (2%) per month.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

1.    Awarding plaintiffs compensatory damages in an amount to be determined at trial, not less than $1.4 million, including interest thereon at the contractually agreed rate;

2.    Awarding Plaintiffs its costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

3.    Granting Plaintiffs such other and further relief as the Court may deem just and proper.

Plaintiffs hereby demand a trial by jury.


Dated: March 12, 2008


MORGAN, LEWIS & BOCKIUS LLP

By: _____
    John M. Vassos
101 Park Avenue
New York, New York 10178
(212) 309-6000

Counsel for Plaintiffs Financial Technology
Partners LP and FTP Securities LLC

16

# Exhibit A

Financial Technology Partners LP | FTP Securities LLC | 601 California Street, 22nd Floor | San Francisco, CA 94108

Steven J. McLaughlin
*Managing Partner*
(415) 512-8704 (office)
(415) 385-9318 (mobile)
steve.mclaughlin@ftpartners.com



---

**PERSONAL AND CONFIDENTIAL**

February 23, 2007

Mr. Brian R. Geisel
CEO and Founder
Alogent Corporation
4005 Windward Plaza
Second Floor
Alpharetta, GA 30005

Dear Brian:

We are pleased to confirm the arrangements under which Financial Technology Partners LP and FTP Securities LLC and their successors (together "FT Partners") are engaged by Alogent Corporation (the "Company") as its exclusive financial and strategic advisor in connection with possible transactions, as outlined herein.

During the term of our engagement, we will provide you with financial advice and assistance in connection with these potential transactions, which may include, among other things, performing financial analyses, searching for purchasers, partners or investors acceptable to you, coordinating potential purchasers, partners and investors, and assisting you in negotiating the financial aspects of a transaction.

The fees for our engagement will in large part depend on the outcome of this assignment.

In connection with the consummation of a transaction or series of transactions in which one or more purchasers acquire directly or indirectly 50% or more of the voting stock, assets (based on the book value of the Company), revenue, income or business, or otherwise gains voting or Board control of the Company, regardless of the structure or form of the transaction (a "Company Sale Transaction"), the transaction success fee payable to FT Partners shall be (i) a minimum of $1.0 million, plus (ii) 10% of aggregate consideration paid in such transaction in excess of $25 million, plus (iii) in the event that aggregate consideration is at least $45 million, an additional $1.0 million.

The Company agrees to pay a non-refundable retainer fee of $100,000, payable in equal monthly installments of $10,000, the first of which is due upon execution of the letter agreement with the remaining installments due monthly thereafter; provided, however, that any such retainer fees paid by the Company to FT Partners shall be fully creditable against a transaction success fee paid to FT Partners within one year of the date herein.

The aggregate consideration for purposes of calculating a transaction success fee in the case of a Company Sale Transaction shall be:

(i) in the case of the sale, exchange or purchase of the Company's equity securities, the total consideration paid for such securities (including amounts paid to holders of options, warrants and convertible securities), plus the principal amount of all indebtedness for borrowed money as set forth on the most recent balance sheet of the Company prior to the consummation of such sale, exchange or purchase; and

Alogent Corporation
February 23, 2007
Page 2 of 5

(ii)  in the case of a sale or disposition by the Company of assets, the total consideration paid for such assets, plus the net value of any current assets not sold by the Company and the principal amount of all indebtedness for borrowed money assumed by the purchaser

While it is not currently anticipated, if the Company elects not to proceed with a Company Sale Transaction and instead raises additional outside equity or equity-linked capital from a party who is not currently an investor in the Company in any single transaction (or if any shareholder sells shares to a third party other than the Company or a current investor in the Company) in which less than 50% of the outstanding common stock or the assets (based on the book value thereof) of the Company is acquired (a "Capital Raise Transaction"), the transaction success fee payable to FT Partners for each transaction shall be 7% of the consideration received in such transaction or transactions.

Amounts paid into escrow and the amount of all contingent payments in connection with any transaction will be included as part of the aggregate consideration for purposes of calculating the transaction success fee at closing. Fees on amounts paid into escrow will be payable upon the establishment of such escrow. Any other amounts to be paid by a buyer contingent upon future events shall be estimated for purposes of the transaction success fee assuming the occurrence of such future events. Aggregate consideration also shall include the aggregate amount of any (i) dividends or other distributions declared by the Company with respect to its stock after the date hereof, other than normal recurring cash dividends in amounts not materially greater than currently paid, and (ii) amounts paid by the Company to repurchase any of its own securities outstanding on the date hereof.

In connection with a Company Sale Transaction involving the sale of less than 100% of the outstanding voting stock of the Company, the transaction success fee will be payable and calculated under the definition of aggregate consideration set forth above as though 100% of the Company's outstanding voting stock on a fully diluted basis had been sold for the same per share amount paid for the Company's outstanding voting stock which was acquired by a purchaser or group of affiliated purchasers. Nevertheless, in the event of the sale of 50% or more of the Company's outstanding voting stock, our services pursuant to this letter agreement will continue after control is obtained to assist you with a second step merger or similar transaction.

Except as provided herein, the Company will promptly pay, or will instruct the purchaser(s) to pay, FT Partners' transaction related advisory fees in cash simultaneously with, or prior to, the consummation of each such transaction as a condition to closing of such transaction. In the event the Company or an acquirer fails to timely pay the fees as described at the amounts and at the times described herein, the unpaid fees and expenses due to FT Partners shall bear interest at the rate of two percent (2%) per month, or the highest rate permitted by law if less, until paid in full.

If any portion of the aggregate consideration is paid in the form of securities, the value of such securities, for purposes of calculating the transaction success fee, will be determined by the average of the last sales prices for such securities on the five trading days ending five trading days prior to the date of the consummation of the transaction. If such securities do not have an existing public trading market, the value of the securities shall be the mutually agreed upon fair market value on the day prior to the consummation of the transaction.

Regardless of whether or not any transaction occurs, the Company also agrees to reimburse FT Partners quarterly or periodically, upon request, and in any event upon consummation of the transaction or transactions contemplated hereby or upon termination of our services pursuant to this letter agreement, for our reasonable out-of-pocket expenses arising in connection with any matter referred to in this letter agreement.

Please note that any written or oral advice provided by FT Partners in connection with our engagement is exclusively for the information of the Board of Directors and senior management of the Company, and such advice and the terms of this letter agreement may not be disclosed to any third party or circulated or referred to publicly without our prior written consent.

In connection with engagements such as this, it is our firm policy and practice to receive indemnification. Accordingly, the Company agrees to the provisions with respect to indemnification and other matters as set forth in Annex A, which is incorporated by reference into this letter agreement.

Our services may be terminated by you or us at any time after the retainer period with or without cause effective upon receipt of ninety (90) days written notice to that effect. For any such termination to be effective, the Company shall immediately pay FT Partners any earned and unpaid fees and shall reimburse FT Partners for any expenses for which FT Partners has not been reimbursed in accordance with the terms of this letter agreement. Following the termination of this letter agreement, FT Partners will be entitled to any applicable transaction success fee if, within two (2) years of such termination, the Company enters into, and subsequently consummates, any agreement with respect to any transaction described above (the "Tail"). In the event that (i) the company has undergone a bona fide sales process during the term of the engagement that does not result in a Company Sale Transaction, (ii) the Company consummates a Capital Raise Transaction of at least $5 million and (iii) the engagement term has been at least nine (9) months, the Tail shall be reduced to one (1) year. In the event that Steven J. McLaughlin is no longer associated with FT Partners, there shall be no Tail. The provisions of this paragraph and paragraphs relating to fees, defined terms relating to fees, expenses, indemnification, accuracy of information, independent contractor status and governing law and jurisdiction shall survive termination of this letter agreement.

The Company recognizes that, in providing our services pursuant to this letter agreement, we will rely upon and assume the accuracy and completeness of all of the financial, accounting and other information discussed with or reviewed by us for such purposes, and we do not assume responsibility for the accuracy or completeness thereof. FT Partners will have no obligation to conduct any independent evaluation or appraisal of the assets, liabilities or other financial statements of the Company or any other party or to advise or opine on any related solvency issues. It is understood and agreed that FT Partners will act under this letter agreement as an independent contractor with duties solely to the Company and nothing in this letter agreement or the nature of our services shall be deemed to create a fiduciary or agency relationship between us and the Company or its stockholders. Except as set forth in Annex A hereto, nothing in this letter agreement is intended to confer upon any other person (including stockholders, employees or creditors of the Company) any rights or remedies hereunder or by reason hereof.

The Company acknowledges that FT Partners' engagement hereunder is exclusive. Accordingly, the Company agrees that it will not, and it will not permit any stockholder, affiliate or advisor, to engage any other person to perform any financial or similar consulting services with respect to any transaction without the prior express written consent of FT Partners. In the event that the Company or its stockholders, affiliates or advisors are contacted by any person concerning a potential transaction, the Company agrees to promptly inform FT Partners of such inquiry, including all relevant details thereof.

As you know and acknowledge, FT Partners is a financial advisory firm focused exclusively in the financial, banking and payments technology sectors and as such must from time to time effect transactions, for its own account or the account of customers, hold positions in securities or options on securities of the Company and other companies which may be the subject of the engagement contemplated by this letter agreement, and may advise, currently or in the future, companies which may be in competition with or may be potential acquirers, investors or targets of the Company. Although in the course of such engagements, FT Partners may acquire information about the transaction or such other parties, FT Partners shall have no obligation to disclose such information, or the fact that FT Partners is in possession of such information to you or to use such information on your behalf. All securities related transactions will be handled exclusively by FTP Securities LLC, member NASD / SIPC.

Upon the successful closing of any transaction as contemplated by this letter agreement (i) the Company will acknowledge FT Partners' role as the Company's advisor in its press release or such joint press release and (ii) FT Partners has the Company's permission to publicly disclose its involvement with the transaction.

FT Partners does not provide accounting, tax or legal advice. The Company is authorized, subject to applicable law, to disclose any and all aspects of this potential transaction that are necessary to support any

Alogent Corporation
February 23, 2007
Page 4 of 5

U.S. federal income tax benefits expected to be claimed with respect to such transaction, without FT Partners imposing any limitation of any kind.

This letter agreement (including Annex A hereto) shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. The Company hereby irrevocably and unconditionally consents to the exclusive jurisdiction of any New York State or United States Federal Court located in New York County over any action or proceeding arising out of or relating to this letter agreement or the matters contemplated hereby and the Company hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard in such State or Federal court. The Company irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process to it at its address set forth above. The Company agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. The Company further waives any objection to venue in the State of New York and any objection to any action or proceeding in such State on the basis of *forum non conveniens*. The Company further agrees that any action or proceeding brought against FT Partners hereunder shall be brought only in the New York State or United States Federal Court located in New York County. Notwithstanding anything to the contrary contained herein, nothing in this paragraph is intended to prevent either party hereto from instituting an action in a jurisdiction outside of New York for the sole and exclusive purpose of enforcing a judgment rendered by a New York State or United States Federal Court located in New York County. **ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY PROCEEDING ARISING OUT OF OR RELATED TO THE SERVICES OF FT PARTNERS HEREUNDER AND THE TRANSACTIONS CONTEMPLATED HEREBY IS HEREBY WAIVED BY FT PARTNERS AND BY THE COMPANY.**

Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed copy of this letter agreement, which shall become a binding agreement upon our receipt. We are delighted to accept this engagement and look forward to working with you on this assignment.

Very truly yours,

FINANCIAL TECHNOLOGY PARTNERS LP
FTP SECURITIES LLC

Steven J. McLaughlin
Managing Partner

Confirmed with binding authority:

ALOGENT CORPORATION

By: _____

Brian R. Geisel
CEO and Founder

Alogent Corporation
February 23, 2007
Page 5 of 5

### *Annex A*

The Company will reimburse FT Partners for its costs and expenses, including the fees and expenses of legal counsel, incurred in connection with any actual or threatened action, proceeding, claim or investigation brought by or against any person, including stockholders of the Company, which FT Partners has incurred in connection with or as a result of either FT Partners' engagement by the Company or any matter referred to in this letter agreement, whether or not FT Partners is a party and whether or not such claim, action or proceeding is initiated or brought by or on behalf of the Company. The Company also will indemnify and hold FT Partners harmless against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of either our engagement or any matter referred to in this letter agreement, except to the extent of any such loss, claim, damage or liability that a court of competent jurisdiction has determined by a final judgment to have resulted directly and primarily from the gross negligence of FT Partners in performing the services that are the subject of this letter agreement.

If for any reason the foregoing indemnification is unavailable to FT Partners or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by FT Partners as a result of such loss, claim, damage or liability (i) in such proportion as is appropriate to reflect the relative economic interests of the Company and its stockholders on the one hand and FT Partners on the other hand in the matters contemplated by this letter agreement, or (ii) if (but only if) the allocation provided for in clause (i) is for any reason held unenforceable, in such proportion as is appropriate to reflect not only the relative economic interests referred to in clause (i) but also the relative fault of the Company, on the one hand, and FT Partners, on the other hand, with respect to such loss, claim, damage or liability as well as any other relevant equitable considerations. The Company agrees that for the purposes of this paragraph the relative economic interests to the Company and FT Partners of a proposed transaction shall be deemed to be in the same proportion that the total value paid, transferred, exchanged or received or contemplated to be paid, transferred, exchanged or received by the Company or its security holders, as the case may be, as a result of or in connection with such transaction bears to the fees paid or to be paid to FT Partners under this letter agreement; provided, however, that if after accounting for the allocation provisions of (i) or (ii) above, FT Partners would retain responsibility for an amount in excess of the aggregate fees actually paid to FT Partners under this letter agreement, then such excess amount shall also be contributed by the Company.

The reimbursement, indemnity and contribution obligations of the Company under this Annex A shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any affiliate of FT Partners and the partners, directors, agents, employees and controlling persons (if any), as the case may be, of FT Partners and any such affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, FT Partners, any such affiliate and any such person.

The Company also agrees that neither FT Partners nor any of such affiliates, partners, directors, agents, employees or controlling persons shall have any liability to the Company, the stockholders of the Company or any person asserting claims on behalf of or in right of the Company in connection with or as a result of either the engagement of FT Partners or any matter referred to in this letter agreement, except losses, claims, damages or liabilities incurred by the Company that a court of competent jurisdiction has determined by a final judgment to have resulted directly and primarily from the gross negligence of FT Partners in performing the services that are the subject of this letter agreement. In no event regardless of the legal theory advanced, shall any Indemnified Person be liable for any consequential, indirect, incidental or special damages of any nature.

Prior to entering into any agreement or arrangement with respect to, or effecting, any proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Annex A, the Company will notify FT Partners in writing thereof (if not previously so notified) and, if requested by FT Partners, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this paragraph, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions satisfactory to FT Partners. **The provisions of this Annex A shall survive any termination, expiration or completion of the engagement provided by this letter agreement.**